IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

NYZIER FOURQUREAN,

|  |  |  |
|---|---|---|
|  | Plaintiff, | OPINION AND ORDER |
| v. |  | 25-cv-68-wmc |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, |  |  |
|  | Defendant. |  |

Plaintiff Nyzier Fourqurean seeks a preliminary injunction enjoining defendant National Collegiate Athletic Association ("NCAA") from enforcing the so-called "Five-Year Rule,"[1] Article 12.8, that prevents him from competing in a fifth season of college football. Specifically, he asserts that the NCAA's bylaws violate § 1 of the Sherman Act and a host of Wisconsin state laws. Because plaintiff is likely to succeed on his Sherman Act claim on the current record, and would suffer irreparable injury without injunctive relief, the court will grant a preliminary injunction for the reasons explained below.

UNDISPUTED FACTS[2]

For the last two years, Fourqurean has been a student-athlete on the University of Wisconsin-Madison's ("UW") football team who most recently played for UW during the 2024 football season. (Pl. Ex. G (dkt. #4-7).) Fourqurean initially enrolled at an NCAA

---

[1] The Five-Year-Rule is really a misnomer in this case, where defendant is not claiming plaintiff's additional year of eligibility violates the Five-Year Rule but rather a subpart of that rule, limiting student-athletes to "*four seasons* of intercollegiate competition in any one sport."

[2] Except as noted, this factual summary relies principally on defendant's responses to plaintiff's proposed findings of fact ("RPFF").

Division II program, Grand Valley State University ("GVSU") in fall 2020.  (RPFF ¶ 4.)

However, GVSU's 2020-2021 football season was cancelled due to COVID-19 (RPFF ¶ 5),

and the NCAA approved a "season-of-competition waiver" for that season, provided that

the student-athlete met certain criteria.  *DII approves season-of-competition, eligibility relief for*

*2020-21,* *NCAA* https://www.ncaa.org/news/2020/7/22/dii-approves-season-of-

competition-eligibility-relief-for-2020-21.aspx (last visited Feb. 4, 2025).  Fourqurean

apparently qualified for that waiver.

    In the summer of 2021, Fourqurean's father passed away, causing him mental health

challenges and loss of weeks of off-season training, as well as loss of concentration and

commitment during most of that season.  (RPFF ¶ 6; Fourqurean Decl. (dkt. #26) ¶ 5.)

During GVSU's 2021 football season, Fourqurean played in 11 games, but with only 155

total snaps/reps, representing roughly three, full games.  (RPFF ¶¶ 8-9; Pl. Ex. A (dkt. #4-

1) 5.)[3]  In contrast, during the 2022 GVSU football season, he played in 13 games with

515 total snaps/reps.  (Pl. Ex. A (dkt. #4-1) 12.)  Fourqurean also earned no name, image,

and likeness ("NIL") money while he was at GVSU.  (RPFF ¶ 8.)  He then transferred to

UW where he played in the 2023 and 2024 football seasons, playing in 25 total games.

(Pl. Ex. A (dkt. #4-1) 12.)  At UW, he *did* earn NIL money in each of his two seasons:

$5,000 in 2023 and $45,000 in 2024.  Based on discussions to date, Fourqurean expects

---

[3] Although defendant objects to the three-game calculation, asserting that plaintiff has cited to no
admissible evidence, there is admissible evidence that UW represented Fourqurean's 155 snaps
amounted to 3 games of play in its waiver application on his behalf.  (Pl. Ex. A (dkt. #4-1) 5.)  Even
if this were admissible evidence, defendant further asserts that UW's calculation is wrong because
he actually played in 11 games, but that argument does not actually rebut UW's conclusion as to
how many games 155 snaps equates.

to earn hundreds of thousands of dollars in NIL deals in 2025 if he is allowed to continue playing football at UW, though he has not yet signed a contract with UW.[4]

In December 2024, UW applied for a waiver on Fourqurean's behalf, asserting that his father's death impacted his experience at GVSU.  (RPFF ¶ 12; Pl. Ex. A (dkt. #4-1) 2.) Specifically, UW asserted that relief was appropriate under NCAA Division I Article 12.8.1.7.1.1 (Five-Year Rule waiver) and NCAA Division II Article 14.4.3.4.1.7 (three-game exception).  (Pl. Ex. A (dkt. #4-1) 6.)  According to the Five-Year Rule, Article 12.8, "A student-athlete shall not engage in more than *four seasons of intercollegiate competition* in any one sport," and "A student-athlete shall complete the student-athlete's seasons of participation *within five calendar years* from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution."  (Dkt. #16-1, at 17 (emphases added).)  Article 12.8.1.7.1.1 allows for waiver of the Five-Year Rule if, among other circumstances, the "student-athlete is *deprived of the opportunity to participate for more than one season* in his or her sport within the five-year period of eligibility *for reasons that are beyond the control* of the student-athlete or the institution."  (*Id.* at 19 (emphases added).)  Although NCAA Division II had no exception for limited participation in a given season while Fourqurean was at GVSU, beginning in January 2023, that division's Article 14.4.3.4.1.7 allowed a football student-athlete "representing a Division II institution, in their initial year of collegiate

---

[4] More specifically, Christopher Overton, a sports marketing consultant, estimates that Fourqurean could earn between $250,000 and $500,000 in NIL next season (Overton Decl. (dkt. #30) ¶ 3), but because Overton's declaration was provided uninvited only after the preliminary injunction hearing, the court does not specifically rely on this declaration.

enrollment," to "participate in up to three contests in a season without using a season of competition." (Dkt. #16-2, at 14); *DII adopts football proposals providing more season-of-competition flexibility, spring scrimmage, NCAA* https://www.ncaa.org/news/2023/1/14/media-center-dii-adopts-football-proposals-providing-more-season-of-competition-flexibility-spring-scrimmage-opportunities.aspx (last visited Feb. 5, 2025).

In contrast, Division I Article 12.8.3.1.6 allows a Division I football student-athlete to participate in *four* games without using a season of competition. (RPFF ¶ 10; Dkt. #16-1, at 21.) Also, the NCAA recently issued a blanket waiver excepting Division I post-season competition (conference championship, bowl, and College Football Playoff games) from counting towards a player's four-game limit. *REPORT OF THE NCAA DIVISION I FOOTBALL BOWL SUBDIVISION OVERSIGHT COMMITTEE AUGUST 22, 2024, NCAA* https://ncaaorg.s3.amazonaws.com/committees/d1/fbsfboc/Aug2024D1F BSOC_Report.pdf (last visited Feb. 4, 2025).

In support of its application for a waiver of the Five-Year Rule on Fourqurean's behalf, the UW represented to the NCAA that: (1) Fourqurean's 2021 snap count equated to three full contests or less; (2) his initial year of enrollment was really the 2021 season due to the canceled 2020 season; and (3) his personal circumstances (2020 canceled season, lack of roster depth, team injuries, blow out victories, and the impacts of his father's death) supported granting him a waiver. (Pl. Ex. A (dkt. #4-1) 5.) While there is some dispute as to whether UW asked for a hardship waiver *specifically*, it certainly asserted that there were circumstances beyond Fourqurean's control under Article 12.8.1.7.1.1 and under the "totality of circumstances" more generally. (*Id.*)

4

On January 29, 2025, the NCAA summarily denied the waiver application explaining:

> Requirements of the legislation are not satisfied: Specifically, staff noted legislation as established by the Division II membership, specifically identifies circumstances that support relief from use of a season of competition following participation in competition.  Staff noted SA competed in 11 contests, two of which occurred during post season, which exceed legislated limit, and institution was unable to provide objective documentation satisfying any of the legislated exceptions or other extenuating circumstances which would enable staff to provide relief consistent with intent of legislation[.]

(Pl. Ex. A (dkt. #4-1) 1.)[5]

The NCAA has also filed contemporaneous communications from the time that UW's waiver application on Fourqurean's behalf was pending.  (Dkts. ##37 to 37-8.)  UW representative Joel Ott contacted NCAA staff about the waiver request shortly after it was filed.  (Dkt. #37-2, at 1.)  In an internal triage form, an NCAA staffer wrote on December 11, "I think we're looking at 21-22 when [student-athlete] competed in 11 [games], including 2 during postseason?"  What is mitigation?  That's basically the entire season.  I think they are asserting the number of snaps he took but that's [not] how the legislation is looked at."  (Dkt. #37-6.)  About a week after the application had been submitted, Ott contacted NCAA staff, asking if he could provide new information in support of the waiver request.  (Dkt. #37-3.)  The NCAA told Ott that he could, and he provided an additional statement from Fourqurean on January 3, 2025.  An NCAA staffer spoke with Ott again

---

[5] Following the preliminary injunction hearing, the NCAA was allowed to file contemporaneous communications from the time that the UW's waiver application on Fourqurean's behalf was pending.

on January 8, 2025, discussing whether Fourqurean had met with a counselor after his father died. (Dkt. #37-5.) Jerry Vaughn, the Director of Academic and Membership Affairs at the NCAA, represents that neither UW nor Fourqurean submitted documentation that he met with a counselor or mental health professional. (Vaughn Decl. (dkt. #37) ¶ 10.) On January 17, Ott informed the NCAA that Fourqurean planned to request a preliminary injunction. (Dkt. #37-2, at 1.) Vaughn represents that NCAA in-house legal counsel then spoke with Fourqurean's counsel, explaining that it would be willing to review any objective or contemporaneous documentation regarding his mental health, and Fourqurean submitted additional statements from friends, teammates, and coaches. (Vaughn Decl. (dkt. #37) ¶¶ 13-14; Dkt. #37-7.)

The UW has until Friday, February 28, 2025, to appeal the NCAA's decision, and Fourqurean's attorney explains that he wants to stay at UW to take advantage of NIL opportunities and participate in revenue sharing. (RPFF ¶ 3.)[6]

## OPINION

To obtain a preliminary injunction, Fourqurean must show that: (1) he is "likely to succeed on the merits"; (2) traditional legal remedies would be inadequate; and (3) he will suffer irreparable harm without the relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Finch v. Treto*, 82 F.4th 572, 578 (7th Cir. 2023). If he passes these thresholds, the court proceeds to balance the equities, weighing the harm that plaintiff would suffer absent a preliminary injunction against the harm defendant would suffer were a

---

[6] The NCAA disputes whether revenue sharing is possible under *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69 (2021).

preliminary injunction issued, as well as considering whether an injunction is in the public interest.  *Finch*, 82 F.4th at 578; *United States v. Town of Lac du Flambeau*, No. 23-CV-355-WMC, 2024 WL 4297671, at *4 (W.D. Wis. Sept. 26, 2024).   A party seeking a preliminary injunction "must make a *strong showing* that [it] is likely to succeed on the merits," while "a mere possibility of success" is not enough to show a likelihood of success on the merits.  *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020) (emphasis added).

## I.  Sherman Act Claim is Likely to Succeed

Given the trend in the law since *Alston*, plaintiff has made a strong showing of likelihood of success on his claim under § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, which prohibits agreements that *unduly* restrain trade.   594 U.S. at 81 ("the phrase 'restraint of trade' is best read to mean 'undue restraint'" (quoting *Ohio v. American Express Co.*, 585 U.S. 529, 540 (2018)).   To state a claim under § 1, a plaintiff must show three elements: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in [a] relevant market; and (3) an accompanying injury."  *Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 703 (7th Cir. 2021) (quotation marks omitted).

Since *Alston*, no one can reasonably dispute that the NCAA and its members (like other associations of competitors) amount to a "combination, contract, or conspiracy."  *See Alston*, 594 U.S. at 85, 107 (affirming district court's entry of a permanent injunction against the NCAA in a case brought under the Sherman Act).  Instead, whether plaintiff has a likelihood of success hinges on whether the NCAA unreasonably restrained trade and

7

caused a market injury.  As to the former, *Alston* indicates that courts should apply a three-step, "rule-of-reason" framework in analyzing anticompetitive effects.  *Alston*, 594 U.S. at 87-96 (rejecting NCAA's arguments that district court erred by applying the rule of reason).  At step one of the rule of reason framework, plaintiff must show that "the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market."  *Ohio*, 585 U.S. at 541.  If plaintiff meets his burden, then the case proceeds to step two where "the burden shifts to the defendant to show a procompetitive rationale for the restraint."  *Id.*  Finally, if defendant shows a procompetitive rationale, then "the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means."  *Id.* at 542.

### A.  Defendant Unreasonably Restrained Trade

As an initial matter, defendant criticizes plaintiff for not defining the relevant market (dkt. #15, at 30-32), but the U.S. Supreme Court has already defined it.  Indeed, the Supreme Court recognized that "NCAA's Division I essentially *is* the relevant market for elite college football."  *Alston*, 594 U.S. at 81 (emphasis original).  In fact, with the growing impact of NIL money at elite college football programs already topping $1 billion last year (Pl. Ex. E (dkt. #4-5) 3), the relevant market is rapidly narrowing to Football Bowl Subdivision teams, or even arguably to the Power Four conference teams (Big Ten, Big 12, Atlantic Coast Conference, and Southeastern Conference) and a few, independent programs.  Regardless, "the NCAA and its member schools have the power to restrain" student-athlete eligibility "in any way and at any time they wish, without any meaningful risk of diminishing their market dominance" for college sports.  *See id.* at 81-82.  Therefore,

the NCAA and its members enjoy monopsony power over student-athletes who effectively have no other market to sell their labor, turning professional (and even then, only after being out of high school for at least three years and using up their college eligibility or receiving approval from the National Football League ("NFL") to enter the draft early). *The Rules of the Draft*, NFL https://operations.nfl.com/journey-to-the-nfl/the-nfl-draft/the-rules-of-the-draft/ (last visited Feb. 6, 2025).

The real issue is whether plaintiff has offered proof of "substantial anticompetitive effect" based on the NCAA's denial of an additional year of college eligibility.  A plaintiff can demonstrate a substantial anticompetitive effect directly or indirectly.  *Ohio*, 585 U.S. at 542.  Direct evidence of anticompetitive effect is "proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market." *Id.* (alteration adopted and citation and quotation marks omitted).  Indirect evidence is "proof of market power plus some evidence that the challenged restraint harms competition." *Id.*

Here, plaintiff has provided no direct evidence of detrimental effects on competition, so the court applies the indirect method.  As the Supreme Court explained, defendant undoubtedly has market power; indeed, "[t]he NCAA *accepts* that its members collectively enjoy monopsony power in the market for student-athlete services, such that its restraints can (and in fact do) harm competition." *Alston*, 594 U.S. at 90 (emphasis original).  Arguably, therefore, *Alston* holds that any restraints by defendant on student-athlete eligibility harms competition.  In any event, while plaintiff has offered little proof that the Five-Year Rule in particular  harms competition by limiting student-athletes

to four seasons of eligibility, it is still apparent that rule has an anticompetitive effect on the market for student-athletes by limiting who is eligible to play college football.[7] Moreover, defendant itself has acknowledged its power in establishing eligibility by promulgating exceptions to the Five-Year Rule, like the "Circumstances Beyond [student-athlete's and institution's] Control," which waive application of the rule in certain circumstances.

Still, defendant rightly points out that the Five-Year Rule does not necessarily "reduce the number of roster spots available to potential participants," since plaintiff's spot will no doubt be filled by another eager applicant were he excluded, and thereby asserting plaintiff cannot show that the Five-Year Rule lessens the total benefits athletes as a whole receive in tuition and cost of attendance. However, defendant ignores that the competitive landscape is now changed because it has allowed higher profile athletes like plaintiff to earn a rapidly growing pie of NIL compensation. *See Pavia v. Nat'l Collegiate Athletic Ass'n*, No. 3:24-CV-01336, 2024 WL 5159888, at *1 (M.D. Tenn. Dec. 18, 2024) ("the NCAA drastically changed the landscape of collegiate athletics by allowing student-athletes to earn compensation for their [NIL]"). To that point, an athlete who is allowed another season could earn additional NIL compensation, which may be life changing for at least some student-athletes. For example, in this case, plaintiff has represented that he is set to make hundreds of thousands of dollars if he is permitted another year of eligibility to play

---

[7] In fairness, plaintiff would also attack other eligibility rules, like Article 14.3.3, which limits a student who transfers to a Division I member institution to three seasons of Division I competition (dkt. #16-1, at 32), but as discussed at oral argument, no other rule appears to block plaintiff from another year of eligibility, so the court does not address them here.

football at UW.  Moreover, defendant's eligibility rules likely depress competition for roster spots, and thus, player NIL earnings, by categorically excluding athletes after four seasons of competition when their marketability for NIL income is more likely than not to be at its apex.  Accordingly, plaintiff has shown that the Five-Year Rule has an anticompetitive effect.

### B. Defendant Has Offered Procompetitive Rationales for the Restraint

Having concluded that the challenged eligibility rule is anticompetitive, the question then is whether defendant has articulated a procompetitive rationale for the restraint.  Defendant argues that the Five-Year Rule is procompetitive because it tethers athletic competition to amateurism and college education, distinguishing it from other sports leagues that have no related arguable amateur component or educational experience. Defendant also argues that, by limiting opportunities to play Division I football through its eligibility rules, it ensures that new cycles of young student-athletes are allowed to participate.  Finally, defendant also asserts that, if the Five-Year Rule were changed and student-athletes became older overall, consumer demand for college athletics may decline, especially as its distinction from far more popular, professional football diminishes.

The court agrees that linking a student-athlete's college athletic career to ordinary degree progression differentiates NCAA Division I football from professional football leagues like the NFL.  As defendant's economic expert explained, "a less differentiated athletic product where athletes are older and less aligned with standard collegiate progression may reduce fan interest and ultimately resources invested in student-athletes." (Backus Decl. (dkt. #20) 8.)  Defendant's argument about ensuring young athletes have

11

an opportunity to Division I football is substantially less persuasive, however, because the NCAA's own rules already allow Division I football teams to fill roster spots with experienced, transfer players, crowding out younger athletes. *Pavia*, 2024 WL 5159888, at *11. So, too, is any argument for these rules promoting amateurism, which rings increasingly hollow with elite college football coaches' salaries, television ratings, and now NIL money for athletes skyrocketing. *Cf. Alston*, 594 U.S. at 110-11 (Kavanaugh, J., concurring). Thus, although the court does not agree with all of defendant's asserted procompetitive effects of the Five-Year Rule, the court concludes that defendant has offered a legitimate, procompetitive rationale for its eligibility restraints on competition being tied to academic progress.

### C. Less Anticompetitive Means Could Achieve Procompetitive Efficiencies

Having found defendant's Five-Year Rule anticompetitive but subject to at least one remaining, legitimate procompetitive rationale, the final question in a rule-of-reason analysis is whether these procompetitive benefits could be accomplished with less anticompetitive means. Before considering whether there are less anticompetitive means to differentiate NCAA Division I football from professional football leagues, the court notes some background principles that guide its analysis. As the Supreme Court explained in *Alston*, judges must be wary "of the temptation to specify the proper price, quantity, and other terms of dealing—cognizant that they are neither economic nor industry experts." 594 U.S. at 102. The Court further explained that "[j]udges must resist the temptation to require that enterprises employ the least restrictive means of achieving their legitimate business objectives." *Id.* at 106.

12

With those cautionary principles in mind, the court will *not* hold that defendant must achieve its procompetitive interest in differentiating college football from professional football by uniformly allowing student-athletes more eligibility, at least not on the record before this court. Although four seasons of total playing time or five years from beginning one's collegiate athletic endeavors does strike the court as somewhat arbitrary, tying eligibility to an ordinary track of academic progress makes sense if the goal of the NCAA and its members is to offer a product of *student*-athletes competing for titles as its primary differentiating feature. However, the court will require that defendant have *meaningful* exceptions to its generally applicable four- and five-year rules.

In particular, the reasonableness of four seasons of eligibility is underscored by data from the UW showing that about 75 percent of college students (although not student-athletes in particular) graduate college in about four years.[8] To be sure, there is at least some reason to believe that *five seasons* of competition would be less restrictive while still differentiating defendant's product, and recent news reports suggest that defendant is considering allowing five seasons of competition. *College sports leaders mulling '5-in-5' rule to eliminate redshirts, waivers and other exemptions*, yahoo! *sports* https://sports.yahoo.com/college-sports-leaders-mulling-5-in-5-rule-to-eliminate-redshirts-waivers-and-other-exemptions-211750014.html (last visited Feb. 5, 2025). However, even if a rule allowing for five seasons of competition might be *less* restrictive than a rule allowing four seasons, that is

---

[8] *From graduation rates to degrees conferred, records fall at UW–Madison*, University of Wisconsin-Madison *News* https://news.wisc.edu/from-graduation-rates-to-degrees-conferred-records-fall-at-uw-madison/#:~:text=UW%E2%80%93Madison's%20four%2Dyear%20graduation,Academic% 20Planning%20%26%20Institutional%20Research%20office. (last visited Feb. 5, 2025).

not necessarily what is required under the Sherman Act. *Alston*, 594 U.S. at 102. Thus, at this point, the court will resist the temptation to expand defendant's terms of dealing with a larger pool of student athletes.

Plaintiff also proposes *tolling* an athlete's eligibility clock until he registers for class at a Division I institution, but this proposal also seems a non-starter, since it would arguably all but end any distinction between college and professional football. Indeed, at least hypothetically, an athlete could play football for four seasons at a Division III school, then spend the next four seasons at a Division II school, and finally transfer to a Division I school with four seasons of eligibility despite having already played college football for *eight years*. Moreover, if the goal of an athlete were to ensure the highest NIL payoff possible, as plaintiff's counsel suggests, at least a few years at a lower NCAA division may make sense, despite the chance of catching on at the professional level diminishing in likelihood as the athlete grows older. As a result, if plaintiff's rule was adopted, it is easy to imagine an 11-year college veteran playing out his final season of college eligibility at age 30, having spent *triple* the amount of time most students spend in college, and in the process largely destroying defendant's differentiated product to the point that college football programs would likely become nothing more than a minor league feeder system for the NFL where players develop for years (or even a decade) until they have optimized their chances of being drafted and sticking on an NFL roster. As concerning is the prospect that Division II and Division III football programs would become nothing more than minor league teams for the most powerful Division I football programs.

14

Even though the court will not require defendant to scrap its Five-Year Rule, therefore, defendant still must have *meaningful* exceptions to its rule to avoid unfairness to student-athletes whose individual circumstances may justify a departure without in any way undermining the procompetitive reason for the eligibility rule overall.   Before considering the specifics of plaintiff's case, the court notes that there is blatant inequity in defendant's current exceptions to the Five-Year Rule that plainly favors the more powerful Division I programs over their Division II counterparts.   Specifically, a Division I football player is allowed to play in *four* games *plus* any additional post-season games without using up a season of eligibility.   Thus, football players would be more attracted to Division I programs to play in four regular season games, one conference championship game, and up to four College Football Playoff games -- a total of nine games at the very highest level of competition -- without it counting towards his four seasons of eligibility.   In contrast, a Division II football player cannot play in more than *three* games, apparently *including* playoff games, without the season counting towards his eligibility.   As importantly for players like plaintiff, that rule did not even take effect until January 2023, while Division I allowed four games of football competition since June 2018, some five years earlier. *Fairness*, *NCAA* https://www.ncaa.org/sports/2021/2/10/fairness-and-integrity.aspx (last visited Feb. 5, 2025).

The current differentiation between Division I and II rules -- allowing for different, limited participation without using a year of eligibility -- are not squarely implicated in this case because plaintiff played in *11* games in 2021, albeit briefly in most.   Nevertheless, these ongoing inequities help frame plaintiff's request for an additional season of eligibility,

especially since plaintiff and his coaches were operating under the assumption that he had burned a year of his college eligibility the moment he played a *single* snap at GVSU in 2021 -- presumably encouraging plaintiff and his coaches to continue to play snaps, however meaningless, given his mental state and limited participation at practices.  In fact, Matt Mitchell, plaintiff's coach at GVSU, avers that he would not have played in 2021 at all, but for his being forced into action in several games due to injuries to other players despite not being physically ready or in a good mental head space.  (Mitchell Decl. (dkt. #28) ¶¶ 14-15.)

Next, in its waiver application on plaintiff's behalf, UW relied on Article 12.8.1.7.1.1, the "Circumstances Beyond Control" exception (Pl. Ex. A (dkt. #4-1) 6), but that exception does not appear to apply in this case, because it requires circumstances that render a college athlete unable to participate in competition, and as stated above, it is undisputed that plaintiff participated in the 2021 football season.  Moreover, even if this narrowing of the exception were justified by some unarticulated, procompetitive reason, that rule should not have proved fatal to plaintiff's case for two reasons.  *First*, the waiver process itself appears problematic given plaintiff's counsel's representation that only the UW, and not plaintiff himself, could apply for a waiver, functionally requiring an NCAA-member institution to sponsor a student-athlete before he can apply for a waiver, further restricting his ability to market his services.  *Second*, even if plaintiff's circumstances do not neatly fit into any *current* exception, requiring a meaningful exception for individuals like plaintiff, whose personal circumstances caused them to participate in a season of competition under difficult circumstances, impacting their performance and playing time

16

under unequal eligibility rules, would be a less restrictive means while still allowing for a robust differentiation between college and professional football products.

In plaintiff's case in particular, several factors suggest that it would be appropriate to exempt his 2021 season from counting as a season of competition under the Five-Year Rule: (1) his father passed away before the season, causing him to miss camp and struggle mentally as attested to by his coach and former teammates (*e.g.*, Second Mitchell Decl. (dkt. #29) ¶¶ 1-8; Jaylon Tillman Decl. (dkt. #31) ¶¶ 4-5); (2) his coach at GVSU represented that he was forced into playing despite being unready (Mitchell Decl. (dkt. #28) ¶ 14); and (3) his relatively low total snap count.  These issues are compounded by the fact that, because plaintiff initially attended a Division II school, he did not have the option of playing in a limited number of games while preserving a year of eligibility. Finally, the NCAA's summary denial of the UW's waiver application for plaintiff, albeit after allowing the UW and plaintiff to submit additional evidence, underscores that there needs to be more meaningful exceptions to the Five-Year Rule to avoid unnecessary antitrust injury without an arguable procompetitive justification.

In sum, with less restrictive means for defendant to limit student-athlete eligibility and differentiate its product from professional football, defendant's failure to adopt and apply *meaningful* exceptions to the Five-Year Rule does not account for competitor's individual circumstances or provide a process that allows a student-athlete to initiate the waiver process himself.

17

### D. Antitrust Injury

Defendant also asserts that plaintiff only alleges an *individual* injury based on his personal circumstances, which is not enough to support an antitrust injury. Certainly, to allege an antitrust injury, plaintiff must allege "not only an injury to himself, but an injury to the market as well," *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012) (quotation marks omitted), and plaintiff largely focuses on the harm the eligibility rules did to him. The court recognizes that there would be a *much* stronger case for an antitrust injury had plaintiff provided other examples of similarly-situated student-athletes who were denied waivers. Nevertheless, given the substantial size of the market for Division I football players, it is reasonable to infer that defendant's apparent, wooden application of its eligibility rules and exceptions not only caused plaintiff injury but more likely than not impacted the larger market for like college football players.[9]

## II. Plaintiff Faces Likely Irreparable Harm Absent a Preliminary Injunction

Plaintiff asserts that he faces irreparable harm if no injunction is granted before tomorrow -- Friday, February 7, 2025 -- because without the possibility of returning to UW for another season, he must declare for the NFL draft by that date, which would separately render him ineligible for college football going forward. Plaintiff adds that he will then also

---

[9] At this point, plaintiff's state law claims are largely underdeveloped, and therefore, do not have a substantial likelihood of success, although the court need not reach his claim of an arbitrary and capricious denial of an exception, which seems to have legs for the same reason as his antitrust claim.

miss out on significant NIL opportunities, as well as the opportunity to increase his "exposure" and to develop his "personal brand" by playing college football.[10]

There are at least two troubling aspects to plaintiff's seeking a last-minute preliminary injunction from this court. First, as defendant points out, the issue of counting his "throwaway" year at GVSU has been present for plaintiff since 2022, and certainly throughout his time at UW over the last two plus years, undermining his claim for urgent relief, although since defendant's rules contemplate an application for exception be submitted by a member of the NCAA (in this case, the UW), and not the impacted athlete, perhaps most of this delay is understandable. Second, and at least equally troubling, the effectiveness of the court's entry of a preliminary injunction so close to his draft declaration date is only meaningful if defendant agrees to be bound by it for the next year of eligibility. Otherwise, plaintiff remains, as counsel conceded at oral argument, in an uncertain limbo that this court cannot cure. Even so, the court will consider plaintiff's showing of irreparable harm without an injunction allowing him to continue playing college football.

Certainly, there is at least some evidence that plaintiff may earn hundreds of thousands of dollars in NIL money next season if he is allowed to continue playing college football for another season. Moreover, there is some evidentiary weight behind his assertion that another year of playing college football will allow him to keep building his brand, as "[i]t takes one throw, one catch, one shot, one block to make a student-athlete a household name across the nation." *Ohio v. Nat'l Collegiate Athletic Ass'n*, 706 F. Supp. 3d

---

[10] Plaintiff may also be taken higher in the 2026 NFL draft if he is allowed to compete again in college football, but that is speculative given the risk of underperformance or injury.

583, 594 (N.D.W. Va. 2023) ("college students suffer irreparable harm when they are denied the opportunity to play sports") (quotation marks omitted and alteration adopted). Finally, though more speculative, it is not unrealistic to expect his draft stock to climb over the course of another year of eligibility from undrafted free agent to a draft choice and a higher NFL salary.

Defendant responds that any harm is negated by this opportunity to play in the NFL, but that argument is speculative especially when, by plaintiff's own admission, it is debatable whether he will be drafted at all without another season as UW's starting cornerback. Similarly, as noted, defendant also asserts that plaintiff's delay in bringing this lawsuit undercuts his claimed irreparable harm, but delay is only one factor in deciding whether plaintiff has shown irreparable harm. *See Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 903 (7th Cir. 2001). ("Delay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will face irreparable harm if a preliminary injunction is not entered."). Plus, there is no evidence here that "defendant has been lulled into a false sense of security or had acted in reliance on the plaintiff's delay." *Id.* (quotation marks omitted). Given the uncertainties in predicting the outcome of plaintiff's return to UW for another football season, therefore, the court agrees that at least a portion of the harm caused would be too speculative to assign a monetary value and is, therefore, likely to be an irreparable harm.[11]

---

[11] Of course, the court acknowledges that, when it comes to damages, the parties' positions on this question will flip entirely.

## III. Traditional Legal Remedies Would Be Inadequate

For much the same reason, although money damages may adequately compensate plaintiff for some missed NIL opportunities, money damages would likely be insufficient (or too speculative) to adequately compensate him for the denial of the opportunity to play college football, continue building his brand, and go higher in the NFL draft. *Ohio*, 706 F. Supp. 3d at 594.

## IV. The Balance of Equities and Public Interest Favor Plaintiff

Finally, in light of the narrow scope of the injunction sought, the balance of equities and public interest weigh in favor of granting plaintiff's requested injunction.  While defendant frets that the court's decision will open the floodgates of litigation by encouraging every student-athlete dissatisfied with defendant's waiver denial to come to court, the injunction entered here does *not* enjoin defendant's Five-Year Rule altogether; instead, it narrowly enjoins defendant from applying the Five-Year Rule against this plaintiff without demonstrating that his unique circumstances should not give rise to an exception.

ORDER

IT IS ORDERED that:

1)  Plaintiff Nyzier Fourqurean's motion for a preliminary injunction (dkt. #2) is GRANTED.

2)  Defendant National Collegiate Athletic Association is hereby PRELIMINARILY ENJOINED from enforcing the Five-Year Rule (Article 12.8) as to plaintiff absent a more meaningful demonstration that exceptions to that rule should not apply to plaintiff's requested, additional season of eligibility given the unique circumstances surrounding his 2021-2022 season at Division II GVSU.

3)  Defendant's motion to strike (dkt. #36) is GRANTED.

Entered this 6th day of February, 2025.


BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge