UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

NYZIER FOURQUREAN,

        Plaintiff,

vs.                                            CASE NO. 25-cv-68-wmc

NATIONAL COLLEGIATE
ATHLETIC ASSOCIATION,

        Defendant.

## AMENDED COMPLAINT FOR DECLARATORY,
## INJUNCTIVE AND OTHER RELIEF

1.      Plaintiff Nyzier Fourqurean ("Fourqurean") brings this action to challenge Bylaws Division I, Article 12.8 and Division II, Article 14.4 of Defendant, the National Collegiate Athletic Association ("NCAA"). These bylaws relate to the number of years a student athlete is eligible to play NCAA Division I football.

2.      This action requests declaratory, injunctive and monetary relief against the NCAA, an end to unjustified anticompetitive restrictions on participants in the NCAA Division I football marketplace and to restore the freedom to seek economic opportunity for Fourqurean and other similarly-situated NCAA Division I college football players.

### PARTIES

3.      Until the 7th Circuit Court of Appeals reversed the preliminary injunction, Fourqurean was a NCAA Division I football player at the University of Wisconsin, Madison ("UW-Madison") and resides in Madison, Dane County, Wisconsin.

4.      In 2020, Fourqurean initially attended Grand Valley State University ("GVSU"), a Division II school in Michigan, to play college football.  His initial enrollment at GVSU was the

2020-2021 academic year (football season cancelled due to COVID-19 restrictions) and he remained enrolled there until he transferred to the UW-Madison, a Division I school, in May of 2023.

5.      The NCAA is an unincorporated association that acts as the governing body of college sports. The NCAA includes more than 1,100 member colleges and universities throughout the United States, including institutions in Dane County, Wisconsin. These member institutions are organized into three divisions, and Division I includes more than 350 schools.

6.      Through the NCAA Constitution and Bylaws, the NCAA and its members have adopted regulations governing all aspects of college sports, including specifically, the Bylaws at issue in this case, (1) Division I, Bylaw 12.8 ("Seasons of Competition, Five Year Rule); (2) Division I, Bylaw 12.8.1 ("Five Year Rule"); (3) Division I, Bylaw 12.8.1.1 ("Determining the Start of the Five-Year Period"); (4) Division I, Bylaw 12.02.6 ("Intercollegiate Competition"); (5) Division I, Bylaw 12.8.1.7 ("Five-Year Rule Waiver"); (6) Division I, Bylaw 12.8.1.7.1 ("Waiver Criteria"); and (7) Division I, Bylaw 12.8.1.7.1.1 (Circumstances Beyond Control), and requested the NCAA consider the totality of the circumstances. Relevant excerpts, attached as **Exhibit A**.

7.      The NCAA Constitution and Bylaws were adopted by votes of the member institutions and various NCAA councils, and they may be amended by votes of the member institutions or NCAA councils. Thus, the rules set forth in the NCAA Constitution and Bylaws constitute horizontal agreements between the NCAA and its member institutions and among NCAA member institutions.

8.      As a practical matter, an academic institution that wishes to participate in any meaningful way in the highest and most popular level of collegiate athletics must maintain

membership in the NCAA and abide by the Division I rules and regulations promulgated by the NCAA and its members. Failure to abide by these rules and regulations risks subjecting sports programs at the academic institution to punitive measures from the NCAA.

9.      The NCAA and its member institutions control the highest and most popular level of collegiate athletics. Therefore, any individual who wishes to derive the substantial benefits from competing at the highest level of collegiate athletics must by necessity attend an NCAA Division I member institution.

10.      There are no practical alternatives that provide the unique combination of attributes offered by NCAA Division I athletic programs including: (i) high quality academic educational services, (ii) top-of-the-line training facilities, (iii) best-in-class coaches, (iv) exposure to scouts, agents and team representatives that provide the athlete with the best chance to launch into professional athletic careers, (v) national publicity through national championships and nationwide broadcasting contracts, and, perhaps most importantly, (vi) opportunities to profit from NIL agreements and significant revenue sharing, and (vii) competition at the highest level of collegiate athletics.

11.      If Fourqurean is not granted additional eligibility, Fourqurean's playing opportunities would be limited as playing professional football is essentially foreclosed due to his decision to forego the NFL draft for the 2025-2026 season once the District Court granted a preliminary injunction against the NCAA on February 6, 2025.

12.      For a variety of reasons, including the opportunity to continue to profit from NIL, significant revenue sharing, and other opportunities unique to NCAA Division I Football, Fourqurean decided to return to UW-Madison to play NCAA Division I football and believes he deserves the opportunity to do so in light of his circumstances.

13.     Fourqurean has been offered the opportunity to return to NCAA Division I football by UW-Madison, but the NCAA's Decision issued in February 2025 to deny his waiver request denied him that opportunity.

14.     The NCAA's Decision denying the waiver has caused and will continue to cause Fourqurean significant irreparable harm and constitutes of violation of the Sherman Act as an unreasonable restraint on trade.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over all claims at issue in this action pursuant to 28 U.S.C. §§ 1331 and 1367(a). The Court has federal-question jurisdiction over Fourqurean's claim for violations of the Sherman Act (Count One). The Court has supplemental jurisdiction over Fourqurean's remaining state claims because they are so interrelated with his Sherman Act claim as to form part of the same case or controversy.

16.     This Court has personal jurisdiction over the NCAA because it and its member institutions currently engage in continuous and systematic business in Wisconsin through its guidelines and bylaws for college football purposefully directed at Wisconsin. Defendant and its member institutions conduct athletic competitions, ticket and merchandise sales, television agreements, and other significant revenue-generating activities in Dane County, Wisconsin.

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2)-(3) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District and because the NCAA is subject to personal jurisdiction in this District.

## BACKGROUND FACTS

18.     Fourqurean initially enrolled at Grand Valley State University (GVSU) in Fall 2020.

19.    As a result of strict COVID-19 restrictions, Grand Valley State University's 2020-2021 football season was canceled, including all practices during the fall semester of 2020, and limited socially distanced practice opportunities during the spring semester of 2021.

20.    In addition to the challenges of a global pandemic, Fourqurean's father tragically passed away in a car accident in the summer of 2021 resulting in him missing important weeks of pre-season training.

21.    Combining the setback in summer training/conditioning, the death took a significant toll on Fourqurean mentally, impacting his mental health and his performance on and off the field, as he prepared for his first season of collegiate-level football and his first significant return to football since his senior year of high school in 2019, including a noted inability to focus and concentrate, as well as waning direction and motivation.

22.    While Fourqurean played during the 2021-2022 football season at GVSU, he played spot minutes when the team lacked depth in certain games due to injuries and other team circumstances and competed in only 155 total snaps/reps, the equivalent to only 3 games according to the UW-Madison's calculation.  However, due to the NCAA Bylaws in place for Division II at the time, even this limited participation counted against Fourqurean's total eligibility.

23.    During this same period, Division I football student-athletes who played only limited games gained valuable development through the utilization of NCAA Division I Bylaw 12.8.3.1.6 ("In football, a student-athlete representing a Division I institution may compete in up to four contests in a season without using a season of competition") and all athletes in that division competed during the 2020 COVID season resulting in a 6th season of eligibility during the 2025 season. Fourqurean had no similar opportunity in Division II.

24.     Moreover, as a Division II athlete between 2021-2023, Fourqurean had no opportunity similar to NCAA Division I football athletes to capitalize on his Name, Image and Likeness ("NIL") rights.

25.     After a full, normal off-season, and time to heal from the death of his father, Fourqurean was back to his former self, improved as an athlete and competed in the 2022 season with great success, playing 515 snaps. Thereafter, he transitioned to University of Wisconsin - Madison in May 2023 to play NCAA Division I football. There, for the first time, Fourqurean played 25 total games and he was afforded the opportunities unique to NCAA Division I college athletes, including the ability to earn meaningful compensation for use of his name, image, and likenesses.

26.     In a landmark 2021 decision, *NCAA v. Alston*, 594 U.S. 69 (2021), a unanimous U.S. Supreme Court gutted the prior restraint on what a college athlete could receive in exchange for playing for a Division I institution.  While courts had previously deferred to anticompetitive NCAA rules to protect "amateurism" in the NCAA, when "market realities change, so may the legal analysis," and "the market realities [of college sports] have changed significantly since 1984." *Alston, supra*, 594 U.S. at 98.

27.     Reacting to the Supreme Court's ruling in *Alston*, the NCAA lifted its prohibition on NCAA athletes receiving NIL Compensation on July 1, 2021.  In reality, such opportunities are only meaningfully available to Division I athletes.

28.     In addition, *Alston* paved the way for significant changes in student-athlete compensation, far beyond the direct effect of the *Alston* ruling, which concerned only education-related compensation and benefits, and ultimately led to the settlement of a trio of antitrust cases against the NCAA and several of its conferences, which settlement now permits NCAA-member

- 6 -

schools to directly pay student-athletes for the first time.  *In re Coll. Athlete NIL Litig.*, No. 20-CV-03919 CW, 2025 WL 1675820 (N.D. Cal. June 6, 2025).

29.    Under a new revenue sharing model established as part of the *NIL Litig.* settlement, each NCAA Division I member school party to the settlement may, for the first time, pay athletes direct compensation of up to 22% of certain institutional revenues per year (estimated to equal $20.5 million per school for the 2025–26 season).

30.    Fourqurean recently graduated from the University of Wisconsin - Madison on December 15, 2024, with a degree in Consumer Behavior and Marketplace Studies.  He is currently enrolled in graduate studies the UW-Madison.

31.    On December 6, 2024, UW-Madison submitted a request for a waiver to the NCAA, seeking a determination that Fourqurean be permitted to play another season at UW-Madison due to the unique challenges he faced during his playing career.

32.    The NCAA issued a formal Decision denying the waiver on January 29, 2025.

33.    The NCAA maintains the discretion to waive application of the Five-Year Rule to enable student-athletes to compete for NCAA member institutions as it deems appropriate, on a case-by-case basis.

34.    The NCAA summarily denied the waiver application in a one paragraph decision.

35.    The NCAA has provided blanket waivers of the Five-Year Rule to institutions in light of certain events. One such blanket waiver was granted to institutions due to the COVID-19 pandemic. This waiver permitted institutions to self-apply a waiver of the Five-Year and Intercollegiate Competition Rules for the 2020-2021 season.

36.    The NCAA also granted institutions a blanket waiver of the Intercollegiate Competition Rule in the wake of the decision of the United States District Court for the Middle District of Tennessee on December 18, 2024, in *Pavia v. NCAA*, No. 3:24-cv-01336, 2024 U.S.

Dist. LEXIS 228736 (M.D. Tenn. Dec. 18, 2024), in which case the court granted Diego Pavia ("Pavia"), the quarterback for Vanderbilt University, a preliminary injunction prohibiting the NCAA from (a) counting a year that had Pavia spent playing football at a Junior College as a season of competition for purposes of the Intercollegiate Competition Rule; and thereby (b) barring Pavia, who had otherwise played just three years of Division I college football, from playing for Vanderbilt in the 2025-2026 season.

37.    Similarly here, the NCAA's current Five Year Rule counts time spent participating in athletics at a Division II institution towards the player's four seasons of competition eligibility limit, despite the significant differences between the Division II athletics marketplace and the opportunities provided to  the participants of Division I college athletics.

38.    The NCAA has not, however, issued a similar blanket waiver for those students, like Fourqurean, who had their time in Division I limited by their time spent in Division II.

39.    Fourqurean seeks relief from this Court to enjoin the NCAA from enforcing its Five-Year Rule as it pertains to the facts of this case and to award monetary relief to Fourqurean, as the NCAA's enforcement of the Five-Year Rule in its current form violates Section 1 of the Sherman Act by unlawfully restricting Fourqurean and others similarly situated from participating in NCAA Division I football when extenuating circumstances warrant an exception to the Five-Year Rule that would afford additional eligibility and by counting prior participation at a Division II school towards the four seasons of competition eligibility limit despite the stark differences in the Division I and Division II marketplaces.  Such unlawful restraints have an anticompetitive effect on the NCAA Division I football marketplace that must be remedied.

## RELEVANT MARKET AT ISSUE

40.     As the court in *Pavia v. NCAA, supra* found, the relevant market for purposes of this case is "the labor market for college football athletes in general and NCAA Division I football specifically." *Pavia v. NCAA*, 2024 WL 5159888 (M.D. Tennessee) at *9.   *See also, Braham v. NCAA*, 2025 WL 2017162 (D. Nevada) at *6. and *Elad v. NCAA*, 2025 WL 1304388 (D. New Jersey) at *__.   The *Pavia* Court embraced the labor market defined by the U.S. Supreme Court in *Alston, supra.*

41.     Both *Pavia, supra,* and *Elad, supra,* challenged the lawfulness of the same set of NCAA Division I bylaws as they apply to the same market  - NCAA Division I football.

42.     Within this market, college athletes like Fourqurean compete for roster spots on NCAA Division I football teams and NCAA Division I colleges compete against each other to recruit the best college football athletes to compete on their athletic teams.

43.     The relevant geographic market is the United States. The NCAA and its member institutions are located across the country, and they engage in competition in the relevant labor markets throughout the United States.

44.     There are no alternatives to the NIL Compensation, revenue sharing opportunities, or other benefits college football players receive from participating in NCAA Division I football. The opportunity to participate at the highest level of amateur athletic competition while pursuing a college degree from a Division I institution makes participation in this market unique.

45.     Within this market, the NCAA and its member institutions indisputably possess monopsony power, maintaining exclusive market power, with the sole ability to dictate the rules and regulations for participation in NCAA Division I athletics.

46.    In fact, the relevant market of NCAA Division I football is the sole pathway to NFL opportunities, and participation provides unique benefits, including NIL compensation and revenue sharing, which are not available in any other market, including Division II and other lower divisions or Junior College.

47.    The enactment and enforcement of the Five-Year Rule by the NCAA and its member institutions with college athletes in this relevant market is commercial in nature.

48.    In the post-*Alston* world of NIL compensation and revenue sharing changed "market realities," any past classification of NCAA eligibility rules as "noncommercial" has been rendered moot. *See*, *Elad v. Nat'l Collegiate Athletic Ass'n*, 2025 WL 1202014, at *7 (D.N.J. Apr. 25, 2025) (finding that "[w]hether an antitrust violation exists necessarily depends on a careful analysis of market realities. If those market realities change, so may the legal analysis") (*quoting Alston*, 594 U.S. at 93 (citations omitted)); and *Pavia*, 760 F.Supp.3d at 539 (emphasizing the "new economic reality in the age of NIL compensation"). *See also, Braham v. NCAA*, *supra.*

49.    In the post-Alston collegiate athletic world, the challenged eligibility rules are so intertwined with commercial rules and benefits that they are now considered "commercial" in nature.

50.    In this case, the Five-Year Rule as applied to Fourqurean and others similarly situated is commercial in nature because it directly limits his ability to participate in the revenue sharing and the most lucrative NIL agreements available, which are "commercial transactions." Stated otherwise, the Five-Year Rule significantly affects the earning potential of college athletes and yields significant financial revenue for the member institutions.

51.    As a practical matter, NIL and revenue sharing opportunities are only available to college athletes competing at the NCAA Division I level, as revenue sharing is a Division I concept only and the vast majority of NIL dollars are paid to NCAA Division I athletes.

52.    Fourqurean had no reasonable opportunity to earn any NIL compensation, and earned none, or to participate in revenue sharing, when he played at GVSU, a Division II school.

53.    Although the NCAA is a non-profit organization, the transactions that member institutions make with college athletes yield significant financial revenue for the member institutions and have significant effects on the future earning potential of those college football athletes.

## ANTICOMPETITIVE EFFECTS OF ENFORCEMENT OF THE NCAA'S FIVE-YEAR RULE

54.    The NCAA claims it enacts and enforces rules that it alleges promote the well-being of college athletes and are necessary to preserve the amateurism aspect of Division I college sports.

55.    The NCAA and its member institutions adopt these rules through the member institutions and the Division I Council, making these rules equivalent to horizontal agreements among the NCAA and its member institutions who compete against one another for the labor of Division I college football players.

56.    Despite what the NCAA may claim, the Five-Year Rule, when unreasonably applied, unduly restrains college athletes from participating in a labor market for which there is no equivalent, a labor market which improves their economic opportunity through such participation, and maximizes their personal and athletic growth while benefiting the NCAA member institutions through the output of the best available product. This restriction, when applied without meaningful exceptions,  violates the Sherman Act because it has direct anticompetitive effects that harm both the participants in the marketplace and also the consumers of Division I college football.

57.     The Five-Year Rule cements the NCAA's dominant position in the relevant labor market and, in turn, the NCAA's ability to depress student-athlete participation and compensation below the competitive level by making it more difficult for the NCAA's members to compete against one another for the best athletes.

58.     By enacting and unreasonably enforcing its eligibility rules, like the Five-Year Rule in its current form, the NCAA operates as an organization of employers who are, in essence, decreasing competition in the labor market by forcing out the most experienced potential participants.

59.     Imposing restrictions on who can compete, and thereby who can earn revenue sharing and other NIL compensation and for how long, necessarily has anticompetitive effects.

60.     By imposing such restrictions, the NCAA suppresses the compensation of student athletes by declaring ineligible the very players who would be entitled to the most lucrative financial arrangements because they have spent years developing their athletic skills.

61.     The elimination of experienced athletes like Fourqurean and others similarly situated who faced undeniable adversity warranting a waiver under the Five-Year Rule, also lowers the level of competition in the relevant markets, making it a less desirable form of athletic entertainment, and makes it more difficult for the member schools and conferences to offer the highest level of sports entertainment to consumers be eliminating the most experienced players.

62.     The NCAA can offer no reasonable or persuasive pro-competitive justification for the enforcement of the Five-Year Rule in its current form , specifically as it relates to individuals like Fourqurean whose personal circumstances justify a departure from it, and athletes who have not been given the full four seasons to compete in Division I athletics due to their time spent in the separate and markedly different market of Division II athletics.

63.    Even if the NCAA could offer a potential procompetitive justification for the Five-Year Rule under the present circumstances, any such justification could be accomplished by less restrictive means, such as if a reasonable waiver process with transparency were in place and the eligibility clock started only upon entry into the NCAA Division I labor market.

**IRREPARABLE HARM**

64.    Fourqurean will suffer substantial irreparable harm if the Court does not grant him relief.  Specifically, Fourqurean will be ineligible to play college football moving forward. He will thus be denied the opportunity to participate in and gain the attention and acclaim that would be obtained by him by playing for a Division I football team in one of college football's most prestigious and widely covered conferences, thereby limiting his ability to increase his exposure and further develop his brand, to take advantage of the significant revenue sharing and other NIL deals he has now signed, which are worth several hundred thousand dollars, and to increase his chances of earning an opportunity to play professional football following the 2025-26 season.

65.    Unless he is assured that he will be eligible to play during the 2025-26 season, Fourqurean will also lose the opportunity to practice with the UW-Madison football team in 2025. These missed practices also would harm Fourqurean irreparably.  If Fourqurean is not declared eligible to play in the 2025-26 season as soon as possible, UW-Madison will likely find another player to fill his position (defensive back); in that event, Fourqurean will lose the opportunity to play Division I college football this coming season regardless of how his eligibility status is ultimately resolved.

66.    Despite the obvious and immediate harm that Fourqurean will suffer if not granted the requested eligibility waiver, the NCAA continues to refuse to grant him such a waiver.  This, Fourqurean asks this Court to provide relief on an emergent basis.

**COUNT I:**
**UNREASONABLE RESTRAINT OF TRADE IN VIOLATION OF § 1 OF THE**
**SHERMAN ACT, 15 U.S.C. § 1**

67.     Fourqurean incorporates by reference every allegation contained in this Amended
Complaint.

68.     Defendant NCAA, by and through its officers, directors, employees, agents or other
representatives, and its member institutions have entered an illegal agreement to restrain and
suppress competition in the NCAA Division I football marketplace through the enforcement of the
Five-Year eligibility Rule in its current form under the facts presented herein.

69.     The restraint imposed by the enforcement and application of the Five-Year Rule in
its current form under the circumstances presented herein cannot withstand analysis under the rule
of reason.

70.     The market for athletic services is Division I football, more specifically NCAA
Division I football, which is the relevant antitrust market for purposes of this action.

71.     The eligibility restrictions imposed by the NCAA are commercial in nature due to
changes in revenue sharing and NIL compensation regulations and, therefore, fall under the
purview of the Sherman Act.  *See, Elad* and *Pavia, supra.*

72.     The enforcement of the Five-Year Rule in its current form among horizontal
competitors has unreasonably restrained competition among schools for the college athletes, like
Fourqurean, competing in the Division I football marketplace.

73.     The actions of the NCAA in unreasonably restraining competition through the
application of the Five-Year Rule under the circumstances presented herein include, but are not
limited to:

- 14 -

a.      preventing college student-athletes like Fourqrean that attended Division II schools from competing in a full four seasons of NCAA Division I football due to prior attendance at a Division II school, therefore limiting their economic opportunities to participate in the unique market opportunities, including, but not limited to, the current revenue sharing and NIL marketplace, available to NCAA Division I athletes;

b.      arbitrarily and capriciously applying the NCAA's own rules and regulations in the denial of an eligibility waiver to Fourqrean and those similarly situated, who suffer undeniably adverse circumstances that effect their ability to meaningfully participate;

c.      ignoring the NCAA's own guidelines for transfers between NCAA member institutions by college student-athletes and denying eligibility waivers when circumstances exist to support the granting of such waivers;

d.      enhancing the NCAA's dominant position in the Division football marketplace and thus its ability to depress student-athlete compensation below the competitive level, making it more difficult for the NCAA's members to compete against one another for the best athletes;

e.      artificially restraining and depressing the number of athletes that participate in Division I football and for how long by forcing out of the relevant market the most talented and experienced athletes in favor of the less experienced athletes in order to limit the relevant labor market;

f.      depressing NIL compensation, distorting the relevant market, and harming consumer welfare by declaring ineligible the very players who would be entitled to the most lucrative financial arrangements because they have spent years developing their athletic skills, and thus preventing member schools from putting out the best product; and

g.    artificially restraining competition not only in NIL services among athletes, but also in significant revenue sharing.

74.    The NCAA can offer no reasonable or persuasive pro-competitive justification for the application of the Five-Year Rule in its current form to the circumstances presented herein.

75.    Even if the NCAA could offer a potential procompetitive justification for the Five-Year Rule in its current form herein, any such justification and/or benefit is far outweighed by the anticompetitive effects and harm to competition and to the Division I football athletes who are subject to the unreasonable application of the Five-Year Rule.

76.    Moreover, any potential procompetitive justification for the Five-Year Rule can be obtained by less restrictive alternatives that accomplish the NCAA's goals and/or could be easily modified to address such concerns.

77.    Reasonable and less restrictive alternatives to the NCAA's current anticompetitive practices include, but are not limited to, a reasonable and transparent waiver process that considers the totality of the circumstances of a student athlete to determine if a waiver is appropriate rather than relying on a limited amount of stagnant exceptions that cannot possibly take into consideration all appropriate circumstances and allowing all student-athletes the same amount of playing time in a Division I institution regardless of the path they took to get there so as to not unreasonably restrict their access to the numerous career, NIL, revenue sharing and other opportunities available only to NCAA Division I football participants.

78.    Significantly, rational, consistent, transparent and unbiased application of its own rules, regulations, policies and procedures would allow for a more reasonable and less restrictive alternative to the NCAA's current anticompetitive practices.

79.     The NCAA's unreasonable conduct is ongoing and will continue to impose injury on current and former athletes and consumers of college football unless injunctive relief is granted. This ongoing harm from the application of the Five-Year Rule in its current form has caused, and continues to cause, direct harm to Fourqurean by restricting his ability to participate in the Division I football marketplace and to reap the full benefits of NIL compensation, revenue sharing agreements, and athletic opportunities that are afforded to only those within the Division I football marketplace.  Such restriction limits his opportunities to develop and showcase his skills and talent for a future professional football career, and does so as an unreasonable restraint on the labor markets for Division I football players, institutions and consumers.

80.     As a direct and proximate result of the NCAA's actions, Fourqurean has been, is being, and will continue to be, irreparably injured and financially damaged.

81.     Fourqurean is entitled to recover from the NCAA treble the amount of his actual damages, as well as an award of reasonable attorneys' fees and costs of this suit.

82.     Fourqurean is entitled to a declaratory judgment declaring void and unenforceable any and all NCAA rules, regulations, bylaws, or decisions that prevent him from playing football at the UW-Madison for an additional year under the current system for one year with an appropriately granted waiver and two years if the Five-Year Rule eligibility clock starts only with Division I seasons of competition.

83.     Fourqurean is entitled to a preliminary injunction that enjoins the NCAA from engaging in the ongoing violations described in this Amended Complaint to allow him to play while this case is being litigated.

84.     Fourqurean also is entitled to a permanent injunction that enjoins the NCAA from engaging in the ongoing violations described in this Amended Complaint.

85.    Additionally, the NCAA should precluded from imposing any penalties on UW-Madison, including the NCAA's Rule of Restitution (Bylaw § 12.11.4.2), due to Fourqurean's reliance on the injunction issued by this Court on February 6, 2025, by leaving him subject to serious penalties if the injunction is later voluntarily vacated, stayed or reversed.

## COUNT II:
## TORTIOUS INTERFERENCE WITH CONTRACT WITH SCHOOL

86.    Fourqurean incorporates by reference every allegation contained in this Amended Complaint.

87.    Fourqurean has a contractual relationship with UW-Madison.

88.    As part and parcel of that relationship, Fourqurean is entitled, and indeed expected, to participate on the UW-Madison varsity football team.

89.    The NCAA is aware of this relationship.

90.    The NCAA has interfered with the relationship between Fourqurean and UW-Madison and the expectancies of Fourqurean and UW-Madison.

91.    The NCAA's interference includes, but is not limited to, refusing to grant Fourqurean a waiver when he is entitled to one, acting arbitrarily and/or capriciously with regard to Fourqurean and his eligibility, ignoring his rights, and violating the NCAA's own rules and guidelines.

92.    The NCAA had a duty not to tortiously and/or needlessly interfere in Fourqurean's relationships, and especially had a duty not to refuse to follow its own rules, regulations, bylaws, and guidelines, or to act arbitrarily and/or capriciously with regard to him.

93.    The NCAA's interference with the relationship between UW-Madison and Fourqurean has harmed and will continue to harm Fourqurean, UW-Madison, and the football-consuming public.

94.    Fourqurean is entitled to damages for the NCAA's interference.

**COUNT III:**
**TORTIOUS INTERERENCE – OTHER PARTIES**

95.    Fourqurean incorporates by reference every allegation contained in this Amended Complaint.

96.    Fourqurean has contractual relationships with third parties for the use of his name, image, and likeness.

97.    As part and parcel of those relationships, Fourqurean is expected to be a prominent athlete in the community and the nation as a whole.

98.    The more prominent Fourqurean is as a student-athlete, the more valuable those relationships become.

99.    The NCAA knew or should have known about these relationships.

100.    The NCAA has interfered with the relationships between Fourqurean and the expectancies of Fourqurean and the third parties.

101.    The NCAA's interference includes, but is not limited to, refusing to grant Fourqurean a waiver when he is entitled to one, acting arbitrarily and/or capriciously with regard to Fourqurean and his eligibility, ignoring Fourqurean's rights, and violating the NCAA's own rules and guidelines.

102.    The NCAA had a duty not to tortiously and/or needlessly interfere in Fourqurean's relationships, and especially had a duty not to refuse to follow its own rules, regulations, bylaws, and guidelines, or to act arbitrarily and/or capriciously with regard to Fourqurean.

103.    The NCAA's interference with the relationship between third parties and Fourqurean has harmed and will continue to harm Fourqurean.

104.    Fourqurean is entitled to damages for the NCAA's interference.

## COUNT IV:
## BREACH OF CONTRACT –THIRD PARTY BENEFICIARY

105.    Fourqurean incorporates by reference every allegation contained in this Amended Complaint.

106.    The NCAA "is a member-led organization dedicated to the well-being and lifelong success of college athletes."[1]

107.    The NCAA is in essence and is formed by a collection of agreements and conventions between its members.

108.    As part and parcel of the agreements that form the NCAA, member institutions must offer certain consideration such as ensuring that student-athletes are in good standing, submit documentation demonstrating compliance with academic programs, and submit financial data to the NCAA.

109.    In exchange, the NCAA offers its member institutions the opportunity to play collegiate sports.

110.    As such, the NCAA essentially exists as a result of one or more agreements between its members to administer and promote college athletics.

111.    Student-athletes are the purported beneficiaries of these agreements, a point made explicit by the NCAA:

    a.    "With more than 1,100 member colleges and universities, the NCAA is united around one goal, creating opportunities for college athletes."[2]

---

[1] NCAA 2021 IRS Form 990.
[2] NCAA 2021 IRS Form 990

    b.     "The National Collegiate Athletic Association is a voluntary, self-governing organization of four-year colleges, universities and conferences committed to the well-being and development of student-athletes…"[3]

    c.     "The basic purpose of the Association is to support and promote healthy and safe intercollegiate athletics, including national championships, as an integral part of the education program and the student-athlete as an integral part of the student body."[4]

112.    Thus, even though student-athletes are not parties to the contracts between the NCAA and its member institutions, those agreements were made for the specific benefit of a designated class of which Fourqurean is a member.

113.    The NCAA and its member institutions were competent to enter into the agreements that form the NCAA and allow its member institutions access to the college sports market as administered and controlled by the NCAA.

114.    Those agreements are legal, valid, enforceable contracts.

115.    Student athletes such as Fourqurean were specifically contemplated as beneficiaries of those agreements.

116.    As part of those agreements, the NCAA agreed—either implicitly or explicitly—that it would make its decisions and enforce its rules in compliance with its stated rules, regulations, bylaws, and guidelines and do so in a non-arbitrary, non-capricious manner.

117.    Any and all necessary conditions and/or precedents, dependent obligations, and/or dependent covenants have been met to enforce that portion of the agreements.

---

[3] NCAA Constitution, Preamble.
[4] NCAA Constitution, Preamble.

118.    Defendant NCAA breached the agreements when it arbitrarily and capriciously denied Fourqurean the ability to play collegiate sports for at least an additional year in contravention of the NCAA's own rules, regulations, bylaws, and guidelines.

119.    Fourqurean has standing to sue the NCAA for such a breach as a third-party beneficiary to said agreements.

120.    Fourqurean is entitled to the NCAA's performance under the agreements.

121.    Fourqurean has been harmed and will continue to be harmed by the NCAA's breaches.

122.    All conditions precedent to filing this breach of contract count have been fulfilled.

## COUNT V:
## PROMISSORY ESTOPPEL

123.    Fourqurean incorporates by reference every allegation contained in this Amended Complaint.

124.    By promulgating rules, regulations, bylaws, and guidelines the NCAA made certain promises to college student athletes.

125.    By continually espousing that its main goal is a commitment to student athlete welfare, the NCAA made certain promises to college student-athletes.

126.    By granting waivers from its rules and regulations, the NCAA made certain promises to college student-athletes.

127.    Those promises include, but are not limited to, promises that the NCAA would apply its rules, regulations, bylaws, and guidelines fairly in a non-arbitrary and non-capricious manner and would grant a waiver when one is appropriate.

- 22 -

128.    Those promises include, but are not limited to, promises that the NCAA would not make arbitrary and capricious decisions when it came to college student athletes' welfare.

129.    Those promises include, but are not limited to, promises that the NCAA would genuinely consider and take into special account situations where adherence to NCAA rules and regulations would harm college student athletes' welfare.

130.    Those promises include, but are not limited to, promises that the NCAA would follow its own guidelines when considering whether to grant waivers from NCAA rules, regulations, and bylaws to college student-athletes.

131.    Those promises include, but are not limited to, promises that the NCAA would genuinely consider requests for waivers from NCAA rules and regulations made by college student-athletes.

132.    College student-athletes, including Fourqurean, relied upon these promises.

133.    The NCAA foresaw, or should have foreseen, that college student-athletes such as Fourqurean would rely upon those promises.

134.    Fourqurean reasonably relied upon those promises when making decisions regarding attending college.

135.    Fourqurean reasonably relied upon those promises to his detriment.

136.    Fourqurean has been damaged and will continue to be damaged by his reasonable reliance upon the NCAA's promises.

**COUNT VI:**
**ARBITRARY ENFORCEMENT OF RULES,**
**REGULATIONS, AND/OR BYLAWS**

137.    Fourqurean incorporates by reference every allegation contained in this Amended Complaint.

- 23 -

138.    The NCAA is in essence and is formed by a collection of agreements and conventions between its members.

139.    As part of those agreements, the NCAA agreed –either implicitly or explicitly –that it would make its decisions and enforce its rules in compliance with its stated regulations and rules and to do so in a non-arbitrary, non-capricious manner.

140.    Fourqurean is a third-party beneficiary of those agreements.

141.    Fourqurean is directly affected by the NCAA's decisions and enforcement of its rules, and regulations.

142.    The NCAA has a duty and obligation to Fourqurean to make decisions and enforce NCAA rules in compliance with NCAA stated regulations and rules and to do so in a non-arbitrary, non-capricious, and non-selective manner.

143.    NCAA Bylaws include mechanisms for waiving or exempting an individual or institution from the application of a specific regulation.

144.    The relevant NCAA Bylaws at issue include , (1) Division I, Bylaw 12.8 ("Seasons of Competition, Five Year Rule); (2) Division I, Bylaw 12.8.1 ("Five Year Rule"); (3) Division I, Bylaw 12.8.1.1 ("Determining the Start of the Five-Year Period"); (4) Division I, Bylaw 12.02.6 ("Intercollegiate Competition"); (5) Division I, Bylaw 12.8.1.7 ("Five-Year Rule Waiver"); (6) Division I, Bylaw 12.8.1.7.1 ("Waiver Criteria"); and (7) Division I, Bylaw 12.8.1.7.1.1 (Circumstances Beyond Control), and Fourqurean requested the NCAA consider the totality of the circumstances.

145.    Additionally, NCAA Bylaw 14.02.14 states that "[a] A waiver is an action exempting an individual or institution from the application of a specific regulation. A waiver requires formal approval (e.g., an NCAA committee or a conference, as specified in the legislation)

based on evidence of compliance with the specified conditions or criteria under which the waiver is authorized or extenuating circumstances."

146.     Fourqurean met the necessary qualifications and applied for a waiver, providing the required documentation, asserting facts and circumstances in accordance with the NCAA guidelines.

147.     However, the NCAA issued a formal Decision denying Fourqurean's petition for waiver and his request for an additional year of eligibility.

148.     The NCAA has arbitrarily, capriciously and selectively enforced the relevant rules as they apply to this case.

149.     Upon information and belief, the NCAA has granted numerous waivers to student-athletes in Division 1 collegiate athletics under similar circumstances.

150.     Fourqurean has been irreparably damaged by this arbitrary, capricious and selective enforcement.

151.     Fourqurean is currently, and will continue to be, injured by the NCAA's actions.

152.     Pursuant to Fed. R. Civ. P. 57, this Court has the power to "… declare rights, status, and other legal relations whether or not further relief is or could be claimed."

153.     Fourqurean is entitled to a declaratory judgment declaring as void and unenforceable any and all NCAA rules, regulations, bylaws, or decisions that prevent his immediate eligibility to play at least an additional year of football at UW-Madison.

154.     Fourqurean is entitled to a permanent injunction that enjoins the NCAA from engaging in the ongoing violations described in this Count.

## COUNT VII:
## DECLARATORY JUDGMENT

155.    Fourqurean incorporates by reference every allegation contained in this Amended Complaint.

156.    Pursuant to Fed. R. Civ. P. 57, this Court has the power to "…declare rights, status, and other legal relations whether or not further relief is or could be claimed."

157.    For the reasons stated above, Fourqurean asks this Court to judge, hold, and declare that he has an economic right to market and license his name image and likeness.

158.    For the reasons stated above, Fourqurean asks this Court to judge, hold, and declare that he has two more years under the application of the Five-Year Rule to athletes who transfer from Division II analysis and one more year of eligibility to play Division I football at UW-Madison under the waiver analysis.

159.    For the reasons stated above, Fourqurean asks this Court to judge, hold, and declare that he has a right to be treated fairly by the NCAA.

160.    For the reasons stated above, Fourqurean asks this Court to judge, hold, and declare that he has a right to rational, fair, and equitable decisions by the NCAA when applying its rules, regulations, bylaws, and guidelines to him.

## COUNT VIII:
## RESTRAINING ORDER AND INJUNCTIVE RELIEF

161.    Fourqurean incorporates by reference every allegation contained in this Amended Complaint.

162.    The harm Fourqurean faces as a result of the NCAA's conduct set forth above is irreparable.

163.    The time within which college athletes may compete is limited and no amount of monetary damages can mitigate or undo the harm that comes from being improperly withheld from college athletic contests.

164.    Moreover, by substantially limiting his Division I playing time, the NCAA also has irreparably harmed Fourqurean's chances at playing football professionally.

165.    The 2025-2026 football camp is already underway.  Because Fourqurean agreed with this Court' analysis and decision of February 6, 2025, and followed the grant of the preliminary injunction, he decided to forego the NFL draft and began spring practice with UW-Madison. If a preliminary injunction is not granted, he will be deprived of ability to properly prepare and participate in the upcoming season and will lose valuable compensation in the form of NIL compensation and revenue sharing.

166.    For these reasons, Fourqurean also seeks an injunction from this Court enjoining the NCAA from enforcing its rules, regulations, and/or bylaws that prevent Fourqurean from having two more years of eligibility playing football for UW-Madison under the Division II analysis or one more year of eligibility under the waiver analysis, and enjoining the NCAA from imposing any penalties on Fourqurean and/or UW-Madison for following any injunction issued.

**WHEREFORE,** Fourqurean demands the following:

a.      An order from this Court enjoining the NCAA from enforcing its rules, regulations, and/or bylaws that prevent Fourqurean from having two more years of eligibility playing Division I football under the application of the Five-Year Rule to athletes who transfer from Division II analysis, or one more year under the waiver request;

b.      An order from this Court enjoining the NCAA from imposing any penalties on Fourqurean and/or UW-Madison for following any injunction issued;

c.      All damages due to Fourqurean as a result of the NCAA's conduct;

d.      Treble damages pursuant to 15 U.S.C. § 15;

e.      Fourqurean's attorneys' fees, costs and expenses; and

f.      For such other relief that the Court may deem just and equitable.

Dated this 31th day of July, 2025.

                                        VON BRIESEN & ROPER, s.c
                                        *Attorneys for Plaintiff, Nyzier Fourqurean*

                                        By:    *Electronically signed by Michael P. Crooks*
                                               Michael P. Crooks
                                               State Bar No. 1008918
                                               michael.crooks@vonbriesen.com
                                               Megan Jerabek
                                               State Bar No. 1068921
                                               megan.jerabek@vonbriesen.com
                                               Maria del Pizzo Sanders
                                               State Bar No. 1031037
                                               maria.sanders@vonbriesen.com

**P.O. ADDRESS**:
10 East Doty Street
Suite 900
Madison, WI  53703
608-287-3926